UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

------------------------------------- X
ASMAA SAFI,                           :
                                      :   CASE NO.
         Plaintiff,                   :
                                      :
    vs.                               :
                                      :   **COMPLAINT**
DATAPIPE, INC., and ROBB ALLEN,       :
                                      :   DEMAND FOR JURY TRIAL
         Defendants.                  :
                                      :
------------------------------------- X

Plaintiff Asmaa Safi ("Safi" or "Plaintiff"), by and through her attorneys, Rafkin Esq., PLLC, as and for her complaint against Datapipe, Inc. ("Datapipe") and Robb Allen, alleges as follows:

NATURE OF THE ACTION

1. Plaintiff brings this action against Defendants for equal pay violations, gender discrimination, sexual harassment, and retaliation pursuant to the Equal Pay Act (29 U.S.C. § 206(d)), the New Jersey Law Against Discrimination ("NJLAD") (N.J.S.A § 10:5-1 *et seq.*), failure to pay wages pursuant to N.J.S.A. § 34:11-4.1 *et seq.*, breach of contract and breach of the implied covenant of good faith and fair dealing.

2. Plaintiff is a woman of Arabic descent and an accomplished executive. Over her career she has honed the ability to bring both technical and financial expertise to bear on the structuring of the complex intersection of software, data and related services required to provide global organizations, such as retailers, the ability to give their customers the seamless ability to browse and purchase their offerings whether in a brick and mortar store, through a retailer's website or through third party sites such as Amazon.com. She has in-depth industry knowledge in providing strategic leadership and direction to global organizations in information technology

and managed services disciplines. Her expertise in these areas guides critical IT workloads and transformations between public, private and hybrid cloud environments.

3. Defendant Datapipe is in the business of providing this sophisticated data and systems management service to organizations around the globe. Premier international retailers such as Nike have relied on Plaintiff's work at Datapipe. Her work on behalf of Datapipe and its clients has also resulted in identified savings to Datapipe and its customers in the tens of millions of dollars. Defendant Robb Allen is Datapipe's co-founder and Chief Executive Officer.

4. In 2013, Plaintiff was recruited away from a burgeoning, lucrative consulting business by Datapipe's lead investor to take a full-time role with Datapipe. Defendant Allen, promised her, among other things, that he would give her equity and "make you rich." In fact, Plaintiff has endured a relentless and escalating campaign aimed at extracting the value of her skill, dedication and efforts, while depriving her of equal compensation for equal work and subjecting her to an environment of hostility and retaliation.

5. Datapipe is a company run by men. There is not a single woman on its board of directors or among its chief executives. Indeed, Plaintiff is the only woman in any sort of executive role. Datapipe has refused to pay Plaintiff hundreds of thousands of dollars in commissions it promised to pay her. It has provided equity and compensation packages to its male employees (including those in *lesser* positions than hers), worth millions of dollars more than that provided to her.

6. She has endured gender-based harassment. For example, the company's top executives sat by idly while a drunken executive employed by a key Datapipe vendor *twice* got within inches of Plaintiff's face yelling at her that "all women are fucking prostitutes" and that "women should be on their backs, pregnant." He was so unhinged he had to be physically restrained. Yet, not only did Datapipe do nothing, it later *hired* the same guy to come work for

Datapipe in a role *senior* to Plaintiff and one in which it knew she would have to interact with him

7. Indeed, even after Plaintiff advised that she would be filing a lawsuit, Datapipe still waited weeks before even attempting to investigate Plaintiff's concerns. Even then, Datapipe excluded the assertion of equal pay violations from its investigation and then refused to provide the written findings of the investigation to Plaintiff.

8. Datapipe routinely paid Plaintiff a far less percentage of her commission target while paying its male managers 100% of their targets even though they were based off of the *same* sales performance. When Plaintiff complained, Datapipe retaliated against her. Among, other things, it excluded her from executive meetings and refused to pay her commission compensation. It refused to pay her commission compensation and stripped her of other opportunities to earn commissions.

9. In one of the most recent and jarring examples, shortly after Plaintiff complained about the failure to pay her commission, Chief Executive Officer Allen circulated a video to the executive team. With the exception of Plaintiff, the team is composed of white, non-Muslim men. The video circulated by Defendant Allen was of white supremacists in the aftermath of the recent violence in Charlottesville. The video featured virulently anti-Muslim rhetoric. Based on her status as the only woman and only non-white member of the team and in the context of Defendant Allen's past conduct, including yelling at her in meetings to "speak in English" the implication to Plaintiff was clear. The video distributed by Defendant Allen is found at https://www.youtube.com/watch?v=P54sP0Nlngg.

## PARTIES

10. Plaintiff is a citizen of the State of Connecticut.

11. Defendant Datapipe is a corporation formed under the laws of the State of Delaware and headquartered in Jersey City, New Jersey. Datapipe is a leading provider of managed services for public, private, and hybrid cloud platforms.

12. Defendant Allen is a citizen of the State of New Jersey.

13. During all relevant times, Datapipe was Plaintiff's employer within the meaning of all applicable statutes. Defendant Allen is and was at all relevant times Datapipe's Chief Executive Officer.

## JURISDICTION AND VENUE

14. This Court has federal question jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343. This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff is a citizen of the State of Connecticut, Defendant Datapipe is a citizen of the State of New Jersey and the State of Delaware. Defendant Allen is a citizen of the State of New Jersey and the amount in controversy exceeds $75,000.

15. This court has jurisdiction of Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a), because the state law claims arise from a common nucleus of operative facts with the federal claims and are so related to Plaintiff s federal claims that they form a part of the same case or controversy between the parties under Article III of the United States Constitution.

16. The events giving rise to the claims herein occurred in Jersey City, New Jersey.

17. Venue is proper in the United States District Court for the District of New Jersey under 28 U.S.C. § 1391(b)-(c) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this district.

FACTS COMMON TO ALL COUNTS

<u>Datapipe's Discriminatory Compensation Practices</u>

18. Datapipe is a company run by men. Men occupy every seat on the Board of Directors, every officer position and every senior-most executive position. Indeed, Plaintiff is the only woman on the executive team and was the only woman in any sort of management position up until a year ago. Although Plaintiff is more senior in her tenure and in her scope of responsibility than other men with the Senior Vice President title, Datapipe has steadfastly refused to elevate her title to the Senior Vice President level. It has done so in order to, among other things, use it as a pretense for depriving her of compensation equal to her male counterparts. She is listed last on the company's website while men in lower ranked positions are listed above her.

Commissions

19. Plaintiff was hired as the company's Vice President, Procurement Governance and Operations. Her responsibilities are far broader and encompassing than her title would suggest. She heads up several functions for the company, including, global pricing, billing and inventory, product launches, primary liaison to key clients and shares management responsibility for the sales process. Throughout her time at Datapipe, she has pioneered critical initiatives leading both top and bottom line successes that are chief among the achievements that have put company where it is today. These include, among other things, restructuring the company's pricing model and launching a custom sales configurator solution and customer proposal system. These achievements contributed mightily to enable Datapipe to transform itself from a company booking $300,000 in sales per quarter to a powerhouse bringing it $1.8 million in a single quarter. Plaintiff contributed in a sales and customer pricing role while still executing her

responsibilities as the head of procurement successfully saving the company from many compliance audits and producing a consistently lower cost structure for the company.

20. Datapipe assigned Plaintiff a sales commission of up to $12,500 per quarter. In other words, the maximum commission she could earn in a given quarter was $12,500. The Senior Vice President of Sales, and the head of channel sales, both men, shared responsibility with Plaintiff over the *same* sales operation and earned commissions off of the *same* sales. Datapipe assigned them sales commissions of up to $80,000 and $62,000 respectively per quarter – a range of nearly five to seven times that assigned to Plaintiff. Further, although all of their commissions were based off of the *same* sales performance as Plaintiff's commissions, she received only 60% to 85% of her assigned commission over three quarters. For that same three quarters, the male Senior Vice President and the male head of channel sales, as well as all other men in sales management positions, were paid *100%* of their assigned quarterly commissions.

Equity

21. Datapipe provided equity incentive plans to its male executives and even to male managers in positions lower than Plaintiff's position. These packages provide for an equity exit package *each* worth a minimum of $5 million and with potential upside in excess of $10 million. In contrast, the equity package provided to Plaintiff required her to invest $50,000 of her own money and has a potential upside limited to less than half of that provided to her male counterparts.

22. This is not a theoretical difference to ponder. The company has now announced that it is being acquired by market giant Rackspace. Thus, the upside value of those multi-million dollar packages will be realized by these men. Plaintiff will be left far, far behind, despite her exemplary performance and contributions to the company's success equal to (and in many instances far more substantial than) those of her male counterparts.

<u>Datapipe's Retaliatory Conduct</u>

23.     Plaintiff complained about the company's disparate treatment of her with respect to the quarterly commission payments as described above.  Nothing was done to correct the blatant discrimination in pay.  Instead, Plaintiff received a call from Datapipe Chief Financial Officer, Ed O'Hara.  O'Hara told her that although she would still be expected to discharge her responsibilities over sales, i.e., she would be expected to continue in her sales management role, Defendant Allen had decided that she would no longer be eligible for *any* quarterly commission because, ostensibly, she could not earn both a sales commission and a commission based on her procurement work.  This made no sense as she had been eligible for earning commissions on *both* fronts for past years precisely because she had managerial responsibilities in *both* areas.

24.     The retaliation did not stop there.  As noted, Plaintiff was also entitled to earn additional commission compensation based on her work in procurement. Specifically, the company promised Plaintiff a commission equal to a percentage of the money she saved Datapipe and/or its clients through her procurement and pricing structuring work.  Over her years of employment, she would periodically submit documentation substantiating the procurement related commissions she had earned.  The company would review the submission and pay her the amount.

25.     In the third quarter of 2017, Plaintiff submitted documentation substantiating a procurement commission to which she was entitled in the amount of $459,987.  This commission was based on Plaintiff optimizing expenditures and lowering cost in critical areas such as datacenter rent, client software cost, OEM maintenance support, and, successfully defending the company in a significant license audit resulting in realized savings for that period in excess of $18.4 million. Of that amount, $6.7 million comes in the form of recurring savings on the company's ongoing costs and $11.4 million in savings from non-recurring costs.

26. Departing from its past practice and its agreement with Plaintiff, Datapipe went silent and did not respond to Plaintiff's request for her commission. On August 6, 2017, Plaintiff emailed Frank Sole, Datapipe's Senior Vice President for Human Resources, again inquiring about her commission. Sole did not respond. Instead, in the days following her request, Allen circulated the anti-Muslim video described above. On August 30, 2017, nearly a month after submitting the documentation substantiating her commission, Chief Financial Officer O'Hara berated Plaintiff, challenging for the first time the savings she had achieved and on which the commission was based. Immediately following the call, Plaintiff was removed from the executive team without any discussion or notice.

27. Plaintiff complained to head of human resources Mr. Sole and Defendant Allen about this retaliatory conduct and the humiliation of being removed from the team. Several days later, with no notice to or discussion with Plaintiff, she was re-added to the executive team, at least superficially in that she was added back to the executive team email list. This, however, was not an end to the retaliation. On September 11, 2017, Sole emailed Plaintiff stating that Datapipe was reducing her procurement commission by 60%, from $459,987 to $184,160. No explanation was provided, other than that the company simply viewed the full amount as too high.

28. Throughout this saga, Plaintiff also learned that she had been routinely excluded from executive meetings and key updates regarding the potential sale of the company. For example, in April of 2016, a manager called Plaintiff about a matter discussed at a recent executive team meeting – a meeting held without notice to Plaintiff and without her presence.

29. This was no accident. During some of these meetings, the male executive managers were presented with equity packages far in excess of that provided to Plaintiff as described in more detail above. She also learned that during the diligence and other processes

associated with the potential sale of the company, Datapipe excluded Plaintiff from organizational charts of the executive team. The import of this exclusion was to make clear to the potential bidders that Plaintiff was not a key executive and thus putting her at a disadvantage vis a vis her male counterparts, who would be viewed as essential and thus far more likely to receive lucrative retention offers. This, in fact, is precisely what has transpired in light of the Rackspace acquisition.

30. This exclusion was particularly mean spirited because the presentation provided to Rackspace highlighted Datapipe's revenue recognition classification as a key point of differentiation, making it a more attractive business to acquire. Plaintiff was the key person behind the revenue recognition system touted by Datapipe. She created the strategy for the revenue recognition classification and implemented it to fruition through the customer billing system, allowing the company to report revenue under this new model. These new classifications enable Datapipe to position itself as a hybrid cloud provider making it a far more attractive target for a company like Rackspace. In fact, rather than simply have Plaintiff present on the topic as she had numerous times before, Chief Financial O'Hara pleaded with Plaintiff to give him talking points on the topic so that he could appear knowledgeable about it and present on the topic directly to Rackspace.

<u>Other Indicia of Plaintiff's Hostile Work Environment/Retaliation</u>

31. In addition to the rank retaliation Plaintiff endured as detailed above, she also suffered other acts designed to intimidate her or make her uncomfortable. The male members of the executive team would routinely use profane and sexist language. Typical statements included, "don't be such a pussy" and referring to others as the "biggest swinging dick." Male executives routinely referred to Plaintiff as "my lady," "girl," and "love."

32. In two separate instances, Plaintiff was assaulted by James Tansey. Tansey is a longtime friend of Datapipe's co-founders, Defendant Allen and Chief Data Center Officer Michael Parks. At the times of his assaults, Tansey was an executive and Datapipe's principal contact at Equinix, a key vendor for companies such as Datapipe.

33. At a company event, Tansey approached a group of Datapipe employees, including Plaintiff. Tansey was obviously intoxicated. At one point, with no provocation whatever from Plaintiff, Tansey walked up to her and with just inches between him and her screamed at her that "all women are fucking prostitutes." Tansey was so unhinged that his Equinix colleague Dave Manning had to physically restrain and remove him.

34. In a separate, subsequent incident, Tansey again approached Plaintiff at a work function. Again, he was inebriated. And again, he got within inches of Plaintiff's face and yelled at her, this time saying: "all women should be on their backs, pregnant." Again, Tansey had to be restrained.

35. Plaintiff was visibly shaken by these incidents and rightfully fearful of her physical safety. The company's response to these assaults on its sole female executive by one of its vendors was stunning. First, it removed Plaintiff from the Equinix account, i.e., adopting a policy of "leave the problem, get the victim out of the way." Further, Datapipe did this surreptitiously by excluding Plaintiff from meetings and assigning, without her knowledge, a male executive, Bill Pratt, to take the lead with Equinix.

36. Then, after the second incident, co-founder Parks took it upon himself to tell Plaintiff that Defendant Allen "has an issue with women" and has "a problem with women in roles of power and authority" but that "he doesn't hate you." Hardly a reassuring moment.

37. As for the final insult, after Tansey had twice assaulted Plaintiff, Datapipe *hired him*. Not only that, they hired him as a Senior Vice President – a position *senior* to Plaintiff and one in which it knew Plaintiff would have to interact with him.

38. Indeed, even after Plaintiff advised that she would be filing a lawsuit, Datapipe still waited weeks before even attempting to investigate Plaintiff's concerns. Even then, Datapipe excluded the assertion of equal pay violations from its investigation and then refused to provide the written findings of the investigation to Plaintiff.

39. Throughout this ordeal, Plaintiff was removed from key positions after she had done the hard work to make projects a success and win critical deals for the company. Defendant Allen sought to strip credit for these successes away from Plaintiff and claim them for the male leaders. For example, Plaintiff redesigned the company's pricing model in 2013 and launched a custom pricing and proposal configurator in Salesforce that was used by the entire sales team globally. After the successful launch, she was called into Defendant Allen's office along with Dan Newton, the male Chief Operating Office. Defendant Allen told Plaintiff that ownership of the project going forward would be handed over to Dan, i.e., Newton would assume the frontline leadership mantle. When she complained to Defendant Allen that this was unfair, he told her literally, "the guys will take it from here." Adding insult to injury, Datapipe would continue to assign Plaintiff the responsibility for actually completing the initiative.

40. In another example, Plaintiff's efforts leading global pricing drove the company to set new sales records each and every quarter since mid- 2013. This culminated with winning a $50M contract from Nike in Q2 2015. Plaintiff designed a custom pricing strategy for, and then led, its presentation to Nike decision makers. Once Datapipe extracted the benefit of Plaintiff's expertise and won the deal, it sidelined her once again. Again, Defendant Robb Allen called her

into his office again and told that they were handing Nike over to Ed O'Hara, the Chief Financial Officer.

41. Yet, once again, Plaintiff was still expected to make sure things worked. Datapipe held her responsible for pricing the largest client accounts including Nike, Noble and Allergan, among others. To this day Plaintiff is the only manager with an understanding of Nike's pricing structure, solutions, inventory and the legalities that allowed Nike to setup equipment in Russia for the upcoming 2018 World Cup. Her male counterparts, however, continued to be promoted, while she remained with a lesser title, lesser compensation, lesser equity, but, of course, no less responsibility.

### COUNT I
### (EQUAL PAY VIOLATIONS PURSUANT TO THE EQUAL PAY ACT; N.J.S.A. § 10:5-4)
### [AGAINST DATAPIPE]

42. Plaintiff hereby incorporates by reference paragraphs 1 through 41 as though fully set forth herein.

43. Plaintiff is a female.

44. Plaintiff performed equal work on a job requiring equal skill, effort, and responsibility as certain men employed by Datapipe, and performed such job under similar working conditions.

45. Datapipe treated Plaintiff's compensation differently than it treated the compensation of men, including, but not limited to, plaintiff's incentive compensation, equity compensation, and exit package.

46. Datapipe did not treat Plaintiff's compensation differently based (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

47. Plaintiff suffered damages as a result of Datapipe's violation including the loss of compensation and equity.

48. Further, Defendant acted with malice and/or reckless disregard for Plaintiff's rights thus rendering punitive damages appropriate.

49. By reason of Datapipe's conduct as alleged herein, Plaintiff is entitled to all remedies available under the Equal Pay Act and New Jersey law including but not limited to lost wages and benefits in the form of back pay, interest, attorneys' fees, and liquidated damages.

**COUNT II**
**(GENDER DISCRIMINATION PURSUANT TO N.J.S.A. § 10:5-12)**
**[AGAINST DATAPIPE]**

50. Plaintiff hereby incorporates by reference paragraphs 1 through 49 as though fully set forth herein.

51. Plaintiff is a member of a protected class (female).

52. Plaintiff was qualified for her job and performing it satisfactorily.

53. Plaintiff suffered an adverse employment action. Among other things, Plaintiff was denied advancement and commensurate increases in title and pay, credit for her work, equity compensation, commission compensation, and opportunities for further employment following Datapipe's merger with Rackspace due to Datapipe's discrimination against Plaintiff.

54. Plaintiff's gender was a motivating factor in Datapipe's adverse actions against Plaintiff.

55. Datapipe's stated reason for its adverse action is a pretext to hide gender discrimination.

56. Plaintiff suffered damages as a result of Datapipe's violation including the loss of compensation and equity.

57. Plaintiff further suffered emotional distress and humiliation. Further, Defendant acted with malice and/or reckless disregard for Plaintiff's rights thus rendering punitive damages appropriate.

58. By reason of Datapipe's conduct as alleged herein, Plaintiff is entitled to all remedies available under NJLAD, including but not limited to lost wages and benefits in the form of back pay, front pay in lieu of reinstatement, interest, attorneys' fees, interest and costs, compensatory damages, emotional distress damages and punitive damages, all in amounts to be determined at trial.

## COUNT III
### (SEXUAL HARASSMENT IN VIOLATION OF N.J.S.A. § 10:5 - 12)
### [AGAINST DATAPIPE]

59. Plaintiff hereby incorporates by reference paragraphs 1 through 58 as though fully set forth herein.

60. Plaintiff is a female.

61. Plaintiff was sexually harassed by male executives at Datapipe and a Datapipe vendor. Among other things, Datapipe executives demeaned Plaintiff, and other women (and women in general) in person and on phone calls to which Plaintiff was a party. Executives referred to Plaintiff as "my love" and "my lady." Male Datapipe executives sat by idly while a drunken executive employed by a key Datapipe vendor *twice* got within inches of Plaintiff's face yelling at her that "all women are fucking prostitutes" and that "women should be on their backs, pregnant." Datapipe then *hired* this man in a role *senior* to Plaintiff and one in which it knew she would have to interact with him. Male colleagues also used sexist and inappropriate language routinely in the work places as described more fully above. This conduct was unwelcome and based on sex.

62. The sexual harassment of Plaintiff was severe and/or pervasive and altered the terms and conditions of Plaintiff's employment.

63. Plaintiff perceived her working environment to be hostile or abusive and a reasonable person would consider Plaintiff's working environment to be hostile or abusive.

64. Datapipe had knowledge of sexual harassment against Plaintiff. Datapipe failed to take proper preventative and corrective measures to address sexual harassment.

65. Datapipe is liable for the sexual harassment of Plaintiff because certain male executives engaging in harassment, including Defendant Allen, had the authority to make tangible employment decisions and/or had supervisory authority over Plaintiff.

66. Plaintiff suffered emotional distress and humiliation as a result of Defendants' conduct. Datapipe's conduct was engaged in with malice or reckless disregard for Plaintiff's rights. Accordingly, punitive damages are warranted.

67. As a result of Datapipe's conduct, Plaintiff has suffered and is entitled to recover damages, including lost back wages and benefits, lost future earnings and benefits, medical expenses, compensatory damages for emotional distress, punitive damages, and attorneys' fees and costs.

COUNT IV
AIDING AND ABETTING DISCRIMINATION, HARASSMENT AND RETALIATION
IN VIOLATION OF N.J.S.A. § 10:5 – 12(E)
[AGAINST DEFENDANT ALLEN]

68. Plaintiff hereby incorporates by reference paragraphs 1 through 67 as though fully set forth herein.

69. Defendant Allen is the Chief Executive Officer of Defendant Datapipe, a member of the executive team, has managerial and supervisory authority at Datapipe and is authorized to make tangible employment decisions that affected Plaintiff.

70. Defendant Allen aided, abetted, incited, coerced and/or compelled the discrimination and retaliation against, and sexual harassment of, Plaintiff by Datapipe as more fully set forth above.

71. Defendant Allen was aware of his role as part of the discrimination and retaliation against, and sexual harassment of, Plaintiff at the time that he provided such assistance, and knowingly and substantially assisted in it. Among other things, as the CEO Defendant Allen was Datapipe's top executive and decision-maker and made company decisions with respect to compensation and equity distribution, including the discriminatory denial of equity and commission to Plaintiff. Defendant Allen routinely demeaned Plaintiff, removed her from key positions after she had done the hard work to make projects a success and win critical deals for the company, in the process stripping credit for these successes away from Plaintiff and claiming them for the male leaders. Moreover, in response to complaint of unfair treatment with respect to commissions, Defendant Allen circulated a white supremacist video, including to Plaintiff, and removed her from the executive team communications and then refused to pay the commission earned.

72. Plaintiff suffered emotional distress and humiliation as a result of Defendant Allen's conduct. Defendant Allen's conduct was engaged in with malice or reckless disregard for Plaintiff's rights. Defendant Allen's conduct was engaged in with malice or reckless disregard for Plaintiff's rights. Accordingly, punitive damages are warranted.

73. As a result of Defendant Allen's conduct, Plaintiff has suffered and is entitled to recover damages, including lost back wages and benefits, lost future earnings and benefits, medical expenses, compensatory damages for emotional distress, punitive damages, and attorneys' fees and costs.

### COUNT V
### (RETALIATION IN VIOLATION OF N.J.S.A. § 10:5 – 12(D))
### [AGAINST DATAPIPE]

74. Plaintiff hereby incorporates by reference paragraphs 1 through 73 as though fully set forth herein.

75. Plaintiff engaged in protected activity under New Jersey law by, inter alia, complaining to her managers about unlawful actions she suffered at the hands of Datapipe throughout her employment.

76. Datapipe was aware of such protected activity because Plaintiff directly complained to the head of Human Resources as well as Defendant Allen.

77. Because of Plaintiff's protected activity, Datapipe took adverse employment actions against her, including harassing her, refusing to pay her earned commission, and cutting her compensation potential.

78. Plaintiff suffered emotional distress and humiliation as a result of Defendant's conduct. Defendant's conduct was engaged in with malice or reckless disregard for Plaintiff's rights. Accordingly, punitive damages are warranted.

79. By reason of Datapipe's conduct as alleged herein, Plaintiff is entitled to all remedies available under NJLAD, including but not limited to lost wages and benefits in the form of back pay, front pay in lieu of reinstatement, interest, attorneys' fees, interest and costs, compensatory damages, and punitive damages, all in amounts to be determined at trial.

### COUNT VI
### (BREACH OF CONTRACT)
### [AGAINST DATAPIPE]

80. Plaintiff hereby incorporates by reference paragraphs 1 through 79 as though fully set forth herein.

81. Plaintiff and Datapipe are parties to a contract.

82. Plaintiff performed all of her obligations under the contract.

83. Datapipe breached the contract by, inter alia, failing to pay Plaintiff all amounts owed pursuant to the contract.

84. Datapipe's performance was not excused.

85. Plaintiff has suffered and is entitled to recover contractual damages in the form of unpaid compensation, prejudgment interest, and attorneys' fees in amount to be determined at trial.

### COUNT VII
### (IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)
### [AGAINST DATAPIPE]

86. Plaintiff hereby incorporates by references paragraphs 1 through 85 as though fully set forth herein.

87. Datapipe owes Plaintiff a duty to act in good faith and conduct fair dealing.

88. Datapipe breached its duty to Plaintiff by, among other things, refusing to pay Plaintiff commissions due and owing to her.

89. Datapipe's breach of its duty has proximately cause Plaintiff damages.

90. Plaintiff has suffered and is entitled to recover damages in the form of unpaid compensation and prejudgment interest, in amount to be determined at trial.

### COUNT VIII
### (UNPAID WAGES IN VIOLATION OF N.J.S.A. § 34:11-4.1 ET SEQ.)
### [AGAINST DATAPIPE]

91. Plaintiff hereby incorporates by reference paragraphs 1 through 90 as though fully set forth herein.

92. Datapipe is an employer within the meaning of N.J.S.A. § 34:11-4.1 *et seq*.

93. Plaintiff is an employee within the meaning of N.J.S.A. § 34:11-4.1 *et seq*.

94. Datapipe failed to pay Plaintiff all wages due and owing to her, including, but not limited to, earned commission.

95. Plaintiff is entitled to recover all unpaid wages and prejudgment interest, and in amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff hereby prays for judgment against Defendants on all causes of action and for recovery as follows:

a. Economic damages for past lost wages and benefits (including equity) and future lost wages and benefits (including equity) in an amount to be proven at trial to exceed $10,000,000;

b. Liquidated damages pursuant to statute to exceed $10,000,000;

c. Damages for emotional distress and humiliation in an amount to be proven at trial;

d. Punitive damages in an amount to be proven at trial;

e. Prejudgment interest;

f. Attorneys' fees and costs pursuant to statute; and

g. For such other relief as the Court may deem just and proper.

Executed at Randolph, New Jersey.
Dated: November 15, 2017

RAFKIN ESQ.
1201 SUSSEX TURNPIKE, SUITE 102
RANDOLPH, NJ 07869

By: *Seth R.*
Seth A. Rafkin (NJ Bar No. 230052017)

Attorneys for Plaintiff Asmaa Safi

## JURY DEMAND

      Plaintiff demands a trial by jury of all issues triable by jury in this action.

Executed at Randolph, New Jersey.
Dated: November 15, 2017

                                              RAFKIN ESQ.
                                              1201 SUSSEX TURNPIKE, SUITE 102
                                              RANDOLPH, NJ 07869

                                        By: _/s/ Seth A. Rafkin_____
                                              Seth A. Rafkin (NJ Bar No. 230052017)

                                              Attorneys for Plaintiff Asmaa Safi